Susan WASSELL, Plaintiff–Appellant,

v.

Wilbur L. ADAMS and Florena M. Adams, doing business as Ron–Ric Motel, Defendants–Appellees.

No. 88–1118.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1988.

Decided Jan. 5, 1989.

Harvey J. Barnett, Harvey J. Barnett & Assoc., Ltd., Chicago, Ill., for plaintiff-appellant.

Bruce L. Carmen, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants-appellees.

Before POSNER, COFFEY and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

The plaintiff, born Susan Marisconish, grew up on Macaroni Street in a small town in a poor coal-mining region of Pennsylvania—a town so small and obscure that it has no name. She was the ninth of ten children, and as a child was sexually abused by her stepfather. After graduating from high school she worked briefly as a nurse's aide, then became engaged to Michael Wassell, also from Pennsylvania. Michael joined the Navy in 1985 and was sent to Great Lakes Naval Training Station, just north of Chicago, for basic training. He and Susan had decided to get married as soon as he completed basic training. The graduation was scheduled for a Friday. Susan, who by now was 21 years old, traveled to Chicago with Michael's parents for the graduation. The three checked into a double room at the Ron–Ric motel, near the base, on the Thursday (September 22, 1985) before graduation. The Ron–Ric is a small and inexpensive motel that caters to the fami-

lies of sailors at the Great Lakes Naval Training Station a few blocks to the east. The motel has 14 rooms and charges a maximum of $36 a night for a double room. The motel was owned by Wilbur and Florena Adams, the defendants in the case.

Four blocks to the west of the Ron–Ric motel is a high-crime area: murder, prostitution, robbery, drugs—the works. The Adamses occasionally warned women guests not to walk alone in the neighborhood at night. They did not warn the Wassells or Susan.

Susan spent Friday night with Michael at another motel. On Saturday the Wassells checked out and left for Pennsylvania, and at the Wassells' suggestion Susan moved from the double room that she had shared with them to a single room in the Ron–Ric. Michael spent Saturday night with her but had to return to the base on Sunday for several days. She remained to look for an apartment where they could live after they were married (for he was scheduled to remain at the base after completing basic training). She spent most of Sunday in her room reading the newspaper and watching television. In the evening she went to look at an apartment.

Upon returning to her room at the motel, she locked the door, fastened the chain, and went to bed. She fell into a deep sleep, from which she was awakened by a knock on the door. She turned on a light and saw by the clock built into the television set that it was 1:00 a.m. She went to the door and looked through the peephole but saw no one. Next to the door was a pane of clear glass. She did not look through it. The door had two locks plus a chain. She unlocked the door and opened it all the way, thinking that Michael had come from the base and, not wanting to wake her, was en route to the Adamses' apartment to fetch a key to the room. It was not Michael at the door. It was a respectably dressed black man whom Susan had never seen before. He asked for "Cindy" (maybe "Sidney," she thought later). She told him there was no Cindy there. Then he asked for a glass of water. She went to the bathroom, which was at the other end of

the room, about 25 feet from the door (seems far—but that was the testimony), to fetch the glass of water. When she came out of the bathroom, the man was sitting at the table in the room. (The room had a screen door as well as a solid door, but the screen door had not been latched.) He took the water but said it wasn't cold enough. He also said he had no money, and Susan remarked that she had $20 in her car. The man went into the bathroom to get a colder glass of water. Susan began to get nervous. She was standing between the bathroom and the door of her room. She hid her purse, which contained her car keys and $800 in cash that Michael had given her. There was no telephone in the room. There was an alarm attached to the television set, which would be activated if someone tried to remove the set, but she had not been told and did not know about the alarm, although a notice of the alarm was posted by the set. The parking lot on which the motel rooms opened was brightly lit by floodlights.

A few tense minutes passed after the man entered the bathroom. He poked his head out of the doorway and asked Susan to join him in the bathroom, he wanted to show her something. She refused. After a while he emerged from the bathroom— naked from the waist down. Susan fled from the room, and beat on the door of the adjacent room. There was no response. The man ran after her and grabbed her. She screamed, but no one appeared. The motel had no security guard; the Adamses lived in a basement apartment at the other end of the motel and did not hear her screams.

The man covered Susan's mouth and dragged her back to her room. There he gagged her with a wash cloth. He raped her at least twice (once anally). These outrages occupied more than an hour. Eventually Susan persuaded the rapist to take a shower with her. After the shower, she managed to get out of the bathroom before he did, dress, and flee in her car. To save herself after the rapes, she had tried to convince him that she liked him, and had succeeded at least to the extent that his guard was down. The Adamses'

lawyer tried halfheartedly to show that she had consented to the rapes, but backed off from this position in closing argument.

The rapist was never prosecuted; a suspect was caught but Susan was too upset to identify him. There had been a rape at the motel several years previously (a sailor had opened the door of his room to two men who said they were "the management," and the men raped his wife). There had also been a robbery, and an incident in which an intruder kicked in the door to one of the rooms. These were the only serious crimes committed during the seven years that the Adamses owned the motel.

Susan married Michael, but the rape had induced posttrauma stress that has, according to her testimony and that of a psychologist testifying as her expert witness, blighted her life. She brought this suit against the Adamses on January 21, 1986. It is a diversity suit that charges the Adamses with negligence in failing to warn Susan or take other precautions to protect her against the assault. The substantive issues are governed by the law of Illinois. A jury composed of four women and three men found that the Adamses had indeed been negligent and that their negligence had been a proximate cause of the assault, and the jury assessed Susan's damages at $850,000, which was the figure her lawyer had requested in closing argument. But in addition the jury found that Susan had been negligent too—and indeed that her negligence had been 97 percent to blame for the attack and the Adamses' only 3 percent. So, following the approach to comparative negligence laid down in *Alvis v. Ribar*, 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981)—the decision in which the Supreme Court of Illinois abolished the common law rule that contributory negligence is a complete bar to a negligence suit—the jury awarded Susan only $25,500 in damages. This happens to be approximately the midpoint of the psychologist's estimate—$20,000 to $30,000—of the expense of the therapy that the psychologist believes Susan may need for her post-traumatic stress.

Susan's lawyer asked the district judge to grant judgment in her favor notwithstanding the verdict, on the ground either that she had been nonnegligent as a matter of law or that her negligence was immaterial because the Adamses had been not merely negligent but willful and wanton in their disregard for her safety. In the alternative, counsel asked the judge to grant a new trial on the ground that the jury's apportionment of negligence was contrary to the manifest weight of the evidence. There were other grounds for the motion, but they have been abandoned. The judge denied the motion, and Susan appeals.

Had she filed her suit after November 25, 1986, she could not have recovered any damages, assuming the jury would have made the same apportionment of responsibility between her and the Adamses. Illinois' new comparative negligence statute (Ill.Rev.Stat. ch. 110, ¶ 2–1116; see also ¶ 2–1107.1) bars recovery in negligence (or strict liability product) cases in which the plaintiff's "fault ... is more than 50% of the proximate cause of the injury or damage for which recovery is sought." But as her suit was filed before that date, the new statute is inapplicable. See Ill.Rev.Stat. ch. 34, ¶ 429.7 Historical Note.

■ Susan Wassell's counsel argues that the jury's verdict "reflected a chastened, hardened, urban mentality—that lurking behind every door is evil and danger, even if the guest is from a small town unfamiliar with the area." He takes umbrage at the defendants' argument that Susan's "antennae" should have been alerted when she didn't see anyone through the peephole. He rejects the metaphor, remarking unexceptionably that human beings do not have antennae and that this case is not a Kafka story about a person who turned into an insect (i.e., is not *The Metamorphosis*). He points out that a person awakened from a deep sleep is not apt to be thinking clearly and that once Susan opened the door the fat was in the fire—if she had slammed the door in the rapist's face he might have kicked the door in, as had happened once before at this motel, although she didn't know that at the time.

The Adamses' counsel argued to the jury (perhaps with the wisdom of hindsight) that Susan's "tragic mistake" was failing to flee when the man entered the bathroom. Susan's counsel insists that Susan was not negligent at all but that, if she was, she was at most 5 percent responsible for the catastrophe, which, he argues, could have been averted costlessly by a simple warning from the Adamses. To this the Adamses' counsel replies absurdly that a warning *would* have been costly—it might have scared guests away! The loss of business from telling the truth is not a social loss; it is a social gain.

The common law refused to compare the plaintiff's and the defendant's negligence. See 4 Harper, James & Gray, The Law of Torts § 22.1 (1986). The negligent plaintiff could recover nothing, unless the defendant's culpability was of a higher degree than simple negligence. See *id.*, §§ 22.5, 22.6, and the discussion of "degrees" of negligence in *Alvis v. Ribar, supra,* 85 Ill.2d at 9–10, 52 Ill.Dec. at 26–27, 421 N.E.2d at 889–90. Susan argues that the defendants were willful and wanton, which, she says, would make her negligence as irrelevant under a regime of comparative negligence as it would be in a jurisdiction in which contributory negligence was still a complete defense. See *id.*, 85 Ill.2d at 10, 52 Ill.Dec. at 27, 421 N.E.2d at 890; 4 Harper, James & Gray, *supra,* § 22.6.

Both the premise (that the Adamses were willful and wanton) and the conclusion (that if so, her own negligence was irrelevant) are wrong. As we guessed in *Davis v. United States,* 716 F.2d 418, 429 (7th Cir.1983), that it would, Illinois appears to be lining up with the states that allow the plaintiff's simple negligence to be compared with the defendant's "willful and wanton conduct," see *State Farm Mutual Automobile Ins. Co. v. Mendenhall,* 164 Ill.App.3d 58, 115 Ill.Dec. 139, 517 N.E.2d 341 (1987); see also *Bofman v. Material Service Corp.,* 125 Ill.App.3d 1053, 81 Ill. Dec. 262, 466 N.E.2d 1064 (1984); *Soucie v. Drago Amusements Co.,* 145 Ill.App.3d 348, 99 Ill.Dec. 262, 495 N.E.2d 997 (1986).

We say "appears to be" because only *Mendenhall* discusses the issue and it is not a decision of the Illinois Supreme Court, and because a critical premise of the decision may be shaky. That is the proposition that "willful and wanton" under Illinois law denotes merely a heightened form of negligence, so that there is only a small difference between simple negligence and willful and wanton misconduct despite the ominous sound of the words "willful" and "wanton." See 164 Ill.App.3d at 61, 115 Ill.Dec. at 141–42, 517 N.E.2d at 343–44; *Davis v. United States, supra,* 716 F.2d at 425–27. As we noted in *Davis,* there are two lines of "willful and wanton" decisions in Illinois. One, which seemed to be in the ascendancy when we wrote *Davis,* and is the position taken in section 342 of the Second Restatement of Torts (1965), indeed regards "willful and wanton" as merely a heightened form of "negligent." Section 342 requires only that the defendant "knows *or has to reason to know* of the [dangerous condition of his premises] and *should* realize that it involves an unreasonable risk of harm" (emphasis added). But the cases since *Davis* appear to have swung round to the narrower concept, under which willful and wanton conduct denotes "conscious disregard for ... the safety of others," *Rabel v. Illinois Wesleyan University,* 161 Ill. App.3d 348, 356, 112 Ill.Dec. 889, 895, 514 N.E.2d 552, 558 (1987), or "knowledge that [the defendant's] conduct posed a high probability of serious physical harm to others." *Albers v. Community Consolidated # 204 School,* 155 Ill.App.3d 1083, 1085, 108 Ill.Dec. 675, 677, 508 N.E.2d 1252, 1254 (1987). See also *Soucie v. Drago Amusements Co., supra,* 145 Ill.App.3d at 352, 99 Ill.Dec. at 264, 495 N.E.2d at 999. These formulations come close to—perhaps duplicate—the standard of recklessness that we limned in *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985), a prisoners' suit involving a claim that reckless disregard for prisoners' safety violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Bresland v. Ideal Roller & Graphics Co.,* 150 Ill.App.3d 445, 457, 103 Ill.Dec. 513, 522, 501 N.E.2d 830, 839 (1986), describes willful and wanton

misconduct as "so close to ... intentional misconduct that a party found liable on that basis should not be able to obtain contribution [from his joint tortfeasors]."

If the more recent formulations are authoritative, this would undermine the argument in *Davis* and *Mendenhall* for allowing a plaintiff's simple negligence to be compared with a defendant's willful and wanton misconduct. But it would not help Susan Wassell win her case. No rational jury could find that the Adamses *consciously* disregarded a *high* probability of serious physical harm. Cf. *Doe v. United States*, 718 F.2d 1039 (11th Cir.1983). If the laxer version of "willful and wanton" is used, Susan's argument against permitting the jury to compare her culpability with that of the Adamses falls, yet she might seem in that event to have a powerful fallback position. The laxer the standard for "willful and wanton," the stronger the inference that the Adamses *were* willful and wanton—and if so, surely Susan's own negligence was not so great as to outweigh theirs by a factor of more than 30. But as we shall see in a moment, the defendants' negligence in this case was at most simple, not aggravated, negligence. Indeed, the jury may not have thought the defendants negligent at all.

▮ The district judge was right to deny Susan's request for judgment notwithstanding the verdict. But was he right to deny her request for a new trial? This court treats the question as one of federal law, even in a diversity case. *Davlan v. Otis Elevator Co.*, 816 F.2d 287, 289 (7th Cir.1987); see also *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir.1983). And the federal standard is that "a new trial can be granted only when the jury's verdict is against the clear weight of the evidence," *Davlan v. Otis Elevator Co., supra*, 816 F.2d at 289, and we can reverse only when persuaded that in applying this standard the district judge abused his discretion, *id.*; see also *Foster v. Continental Can Corp.*, 783 F.2d 731, 735 (7th Cir.1986); *Babb v. Minder*, 806 F.2d 749, 752 (7th Cir.1986). The Illinois approach to these questions is similar. See, e.g., *Lowe*

*v. Kang*, 167 Ill.App.3d 772, 782, 118 Ill. Dec. 552, 558, 521 N.E.2d 1245, 1251 (1988); *Mazikoske v. Firestone Tire & Rubber Co.*, 149 Ill.App.3d 166, 181–82, 102 Ill.Dec. 729, 739, 500 N.E.2d 622, 632 (1986); *Junker v. Ziegler*, 113 Ill.2d 332, 339–40, 101 Ill.Dec. 627, 630, 498 N.E.2d 1135, 1138 (1986); *Ford v. City of Chicago*, 132 Ill.App.3d 408, 412–13, 87 Ill.Dec. 240, 244, 476 N.E. 2d 1232, 1236 (1985). So Susan has a tough row to hoe to get the district court's refusal to grant her a new trial reversed.

The old common law rule barring the contributorily negligent plaintiff from recovering *any* damages came eventually to seem too harsh. That is why it has been changed in most jurisdictions, including Illinois. It was harsh, all right, at least if one focuses narrowly on the plight of individual plaintiffs, but it was also simple and therefore cheap to administer. The same cannot be said for comparative negligence, which far from being simple requires a formless, unguided inquiry, because there is no methodology for comparing the causal contributions of the plaintiff's and of the defendant's negligence to the plaintiff's injury. In this case, either the plaintiff or the defendants could have avoided that injury. It is hard to say more, but the statute requires more—yet without giving the finder of facts any guidance as to how to make the apportionment.

We have suggested in previous cases, such as *Davis v. United States, supra*, 716 F.2d at 429, that one way to make sense of comparative negligence is to assume that the required comparison is between the respective costs to the plaintiff and to the defendant of avoiding the injury. If each could have avoided it at the same cost, they are each 50 percent responsible for it. According to this method of comparing negligence, the jury found that Susan could have avoided the attack at a cost of less than one thirty-second the cost to the Adamses. Is this possible?

▮ It is careless to open a motel or hotel door in the middle of the night without trying to find out who is knocking. Still, people aren't at their most alert when they are awakened in the middle of the

night, and it wasn't crazy for Susan to assume that Michael had returned without telling her, even though he had said he would be spending the night at the base. So it cannot be assumed that the cost—not to her (although her testimony suggests that she is not so naive or provincial as her lawyer tried to convince the jury she was), but to the reasonable person who found himself or herself in her position, for that is the benchmark in determining plaintiff's as well as defendant's negligence, see, e.g., *Blacconeri v. Aguayo*, 132 Ill.App.3d 984, 988, 88 Ill.Dec. 231, 234–35, 478 N.E.2d 546, 549–50 (1985); 4 Harper, James & Gray, *supra*, § 22.10, at pp. 334–38—was zero, or even that it was slight. As innkeepers (in the increasingly quaint legal term), the Adamses had a duty to exercise a high degree of care to protect their guests from assaults on the motel premises. See, e.g., *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1558 (7th Cir.1987) (Illinois law); *Yamada v. Hilton Hotel Corp.*, 60 Ill.App.3d 101, 112, 17 Ill.Dec. 228, 237, 376 N.E.2d 227, 236 (1977); *Mrzlak v. Ettinger*, 25 Ill.App.3d 706, 712, 323 N.E.2d 796, 800 (1975); *Fortney v. Hotel Rancroft, Inc.*, 5 Ill.App.2d 327, 125 N.E.2d 544, 546, 548 (1955); *Peters v. Holiday Inns, Inc.*, 89 Wis.2d 115, 278 N.W.2d 208 (1979). And the cost to the Adamses of warning all their female guests of the dangers of the neighborhood would have been negligible. Surely a warning to Susan would not have cost the Adamses 32 times the cost to her of schooling herself to greater vigilance.

■ But this analysis is incomplete. It is unlikely that a warning would have averted the attack. Susan testified that she thought the man who had knocked on the door was her fiancé. Thinking this, she would have opened the door no matter how dangerous she believed the neighborhood to be. The warning that was not given might have deterred her from walking alone in the neighborhood. But that was not the pertinent danger. Of course, if the Adamses had told her not to open her door in the middle of the night under any circumstances without carefully ascertaining who was trying to enter the room, this would have been a pertinent warning and might have had an effect. But it is absurd to think that hoteliers are required to give so *obvious* a warning, any more than they must warn guests not to stick their fingers into the electrical outlets. Everyone, or at least the average person, knows better than to open his or her door to a stranger in the middle of the night. The problem was not that Susan thought that she *should* open her bedroom door in the middle of the night to anyone who knocked, but that she wasn't thinking clearly. A warning would not have availed against a temporary, sleep-induced lapse.

■ Giving the jury every benefit of the doubt, as we are required to do especially in a case such as this where the jury was not asked to render either a special verdict or a general verdict with answers to written interrogatories (Fed.R.Civ.P. 49), we must assume that the jury was not so muddle-headed as to believe that the Adamses' negligence consisted in failing to give a futile warning. Rather, we must assume that the jury thought the Adamses' negligence consisted in failing to have a security guard, or telephones in each room, or alarms designed to protect the motel's patrons rather than just the owners' television sets. (The Adamses did, however, have an informal agreement with the local police that the police would cruise through the parking lot of the Ron–Ric whenever they drove down the street at night—and this was maybe three or four times a night.) The only one of these omitted precautions for which there is a cost figure in the record was the security guard. A guard would have cost $50 a night. That is almost $20,000 a year. This is not an enormous number. The plaintiff suggests that it would have been even lower because the guard would have been needed only on busy nights. But the evidence was in conflict on whether the Sunday night after a Friday graduation, which is the night that Susan was attacked, was a busy night. And the need for a security guard would seem to be greater, the less busy rather than the busier the motel; if there had been someone in the room adjacent to Su-

san's, she might have been saved from her ordeal. In any event the cost of the security guard, whether on all nights or just on busy nights—or just on unbusy nights—might be much greater than the monetary equivalent of the greater vigilance on the part of Susan that would have averted the attack.

 The assumption that the jury was clear-thinking and instruction-abiding is artificial, of course. During its deliberations, the jury sent the judge a question about the duty to warn (the judge did not answer it). This is some indication that the jury thought that the Adamses' negligence consisted in failing to warn Susan. But it is equally plausible that the jury didn't think the Adamses were negligent at all toward Susan, but, persuaded that she had suffered terribly, wanted to give her a token recovery. Concern with sympathy verdicts appears to lie behind Illinois' new statute barring the plaintiff from recovering any damages if he is more than 50 percent negligent. "The adoption of the pure comparative negligence doctrine [the doctrine, adopted in *Alvis v. Ribar*, that allows the plaintiff to recover something however great his negligence was relative to the defendant's] was thought to have increased a plaintiff's chances for winning at trial from about 50% to 60%, even though at the same time it tended to reduce the amount of the damage awards made at trial." Smith–Hurd Ill.Ann.Stat. ch. 110, ¶ 2–1116 Historical Note. It may be more than coincidence that the jury awarded Susan just enough money to allow her to undertake the recommended course of psychological therapy. We are not supposed to speculate about the jury's reasoning process, see, e.g., Fed.R.Evid. 606(b), and we have just seen that it would not necessarily strengthen Susan's case if we did. The issue for us is not whether this jury was rational and law-abiding but whether a rational jury could, consistently with the evidence, have returned the verdict that this jury did.

If we were the trier of fact, persuaded that both parties were negligent and forced to guess about the relative costs to the plaintiff and to the defendants of averting the assault, we would assess the defendants' share at more than 3 percent. But we are not the trier of fact, and are authorized to upset the jury's apportionment only if persuaded that the trial judge abused his discretion in determining that the jury's verdict was not against the clear weight of the evidence. We are not so persuaded. It seems probably wrong to us, but we have suggested an interpretation of the evidence under which the verdict was consistent with the evidence and the law. And that is enough to require us to uphold the district judge's refusal to set aside the verdict.

AFFIRMED.