**FMC CORPORATION, Plaintiff,**

v.

**H & K MACHINE, INC., Defendant.**

**No. 88–C–365.**

United States District Court,
E.D. Wisconsin.

Aug. 1, 1989.

Krukowski & Costello by Kevin J. Kinney, Milwaukee, Wis., Niro, Scavone, Haller, Niro & Rockey, Ltd. by Raymond P. Niro and Robert Vitale, Chicago, Ill., for plaintiff.

Wheeler Law Firm by Allan B. Wheeler, Milwaukee, Wis., for defendant.

### DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

The litigants are competitors in the business of manufacturing and selling pea and bean harvesting machines. The plaintiff, FMC Corporation [FMC], owns a patent on a pea and bean thresher. [Patent No. 3,709,231.] In this action, the plaintiff alleged that the threshing machine produced by the defendant, H & K Machine, Inc. [H & K] infringed its patent either literally or under the doctrine of substantial equivalents. After the jury found no infringement, judgment was entered in favor of the defendant. The plaintiff has moved for judgment notwithstanding the verdict and, alternatively, for a new trial. Both motions will be denied.

The standards to be applied in resolving a motion for judgment notwithstanding the verdict are as follows:

[W]hether there is substantial evidence to support the jury's verdict. Specifically, ... whether the evidence presented, combined with all reasonable inferences that can be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning it. *La Montagne v. American Convenience Prods., Inc.,* 750 F.2d 1405, 1410 (7th Cir.1984). Any conflicts in the evidence must be resolved in favor of the party winning the verdict. *Id.* [The district court does] not judge the credibility of the witnesses. *Freeman v. Franzen,* 695 F.2d 485, 489 (7th Cir.1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). While the [district court does] not reweigh the evidence as a jury would, [it does] "weigh the evidence to the extent of determining whether the evidence to support the verdict is *substantial;* a mere scintilla of evidence will not suffice." *La Montagne,* 750 F.2d at 1410.

*McCalpine v. Foertsch,* 870 F.2d 409, 414 (7th Cir.1989) (emphasis in original)

FMC's position is that it should be granted judgment notwithstanding the verdict because the evidence is not sufficient to support the jury's verdict. In its brief, FMC discusses the evidence and concludes that it requires a finding of literal infringement and, alternatively, a finding of infringement under the doctrine of equivalents.

■ The obvious flaw in FMC's analysis is that it usurps the jury's function of weighing the evidence. For instance, FMC first points to the deposition testimony of Mr. Wallace, the president of defendant, H & K, and highlights the fact that at the time of his deposition Mr. Wallace stated that there was support for the conclusion that the H & K thresher had a central beater; that position is inconsistent with Mr. Wallace's subsequent testimony at the trial. FMC then argues that this prior statement is entitled to *"greater* weight." (Plaintiff's brief p. 6). Such is not the law, nor was it the way the jury was instructed. The following instruction was submitted jointly by the parties and was given without modification:

In weighing the effects of a discrepancy, consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood. After making your own judgment you will give the testimony of each witness such weight, if any, as you think it deserves.

A witness may be discredited or impeached by contradictory evidence or evidence that at some other time the witness has said or done something, or failed to do something which is inconsistent with the witness's present testimony. If you believe any witness has been impeached and, thus, discredited, it's your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

(Trial Tr. pp. 678–79).

■ The court is persuaded that with regard to each of the disputed aspects of the patent in suit substantial evidence was presented to support the jury's finding that no infringement occurred. For example, the evidence regarding the existence of a "generally centralized beater" consisted of testimony from Mr. Slates, an inventor, co-applicant of the patent and employee of FMC, and of testimony from Mr. Wallace, H & K's president. The respective briefs point to portions of the record where both witnesses address the issue of the "generally centralized beater." On direct examination, Mr. Slates said such beater existed, but on cross examination, Mr. Slates testified that H & K's main beater was not in the center. Mr. Wallace, called adversely, testified that there was support for the conclusion that the H & K machine had a generally centralized beater. When further examined by defense counsel, Mr. Wallace testified that, in engineering terms, he would not categorize H & K's main beater as generally centralized.

The same type of interplay of testimony exists as to the other points in dispute. After reviewing the comprehensive briefs and the trial transcript, the court finds that

there is ample evidence to support the jury's verdict.

■ FMC also argues that it is entitled to judgment as a matter of law under the doctrine of equivalents. The plaintiff contends that the jury verdict must be in its favor because H & K failed to contradict the evidence of substantial equivalents.

The plaintiff's argument assumes, of course, that the jury found its evidence of substantial equivalents to be credible. The jury was instructed on assessing credibility and assigning weight to unrebutted evidence. The pertinent jury instruction stated:

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness's general motive, state of mind, demeanor and manner while on the stand. Consider the witness's ability to observe the matters to which he or she has testified and whether the witness impresses you as having an accurate recollection of those matters. If the testimony has not been rebutted or contradicted by anyone, you should take that into account in weighing the evidence.

(Trial Tr. pp. 677–78).

The only evidence of substantial equivalence came from the plaintiff's witness, Mr. Slates. The jurors could have discredited his testimony because of his close connection to the patent and his allegiance to FMC. The jurors may well have found that the plaintiff failed to prove substantial equivalence by a preponderance of the evidence.

Alternatively, the plaintiff asserts that it is entitled to a new trial. "[A] new trial can only be granted when the jury's verdict is against the clear weight of the evidence." *Wassell v. Adams*, 865 F.2d 849, 854 (7th Cir.1989), quoting, *Davlan v. Otis Elevator Co.*, 816 F.2d 287, 289 (7th Cir. 1987). A new trial may be warranted to prevent a miscarriage of justice. *Cornelius v. LaCroix*, 631 F.Supp. 610, 616 (E.D. Wis.1986), aff'd in part and rev'd in part, 838 F.2d 207 (7th Cir.1988).

FMC submits a two-pronged challenge: First, it asserts that the jury's verdict was contrary to the clear weight of the evidence; second, it argues that injustice occurred due to the court's method of presenting the instructions to the jury. As previously discussed, the jury's verdict was not contrary to the manifest weight of the evidence. That argument as well as the plaintiff's second argument is without merit.

■ The jury trial in the instant action commenced on Monday, May 22, 1989. The receipt of evidence was concluded at noon on Friday, May 26, 1989, the last working prior to the Memorial Day holiday weekend. Shortly after noon on Friday, the plaintiff's counsel expressed his desire that the case be given to the jury that afternoon. (Trial Tr. p. 616). Neither side requested an adjournment because of the impending three day weekend.

Both before and after the court's instructions were given to the jury, the court advised the jurors that if they had questions about the instructions, they were free to ask them. (Trial Tr. pp. 638 and 711) During the delivery of the instructions, the court inquired whether any juror was having difficulty hearing the instructions; not one affirmative response was received. (Trial Tr. p. 686) Additionally, not one question was posed to the court. At no time did the jurors request that the instructions, or portions of them, be provided to them in written form.

Notwithstanding the foregoing, the plaintiff has broadly attacked the court's method of instructing the jury. The plaintiff charges (1) that the instructions were too complex to be understood, absent a written copy; (2) that the instructions could not be followed or understood because the judge's voice dropped, and that the speed of delivery was too fast; (3) that the denial of plaintiff's request that a written set of instructions be provided the jury was unfair; (4) that the intervening three day weekend between the instructions and deliberations resulted in a miscarriage of jus-

tice; (5) that it was prejudicial error to condition the submission of the written instructions to the jury on the existence of a stipulation between the parties; and (6) that defense counsel's trial tactic of refusing to so stipulate was not in the interest of justice.

To support these arguments, the plaintiff has rolled out an arsenal of weapons. The plaintiff has submitted the affidavits of three of its attorneys, a chemical engineer and one of its trial witnesses in support of its position that the instructions could not be heard or understood. The plaintiff also has hired three communication experts to assess the complexity of the instructions. Each has offered an opinion that it would be difficult to remember and apply the instructions because of the intervening three day weekend. The defendant has filed a number of affidavits squarely contradicting those of the plaintiff.

The plaintiff's suggestion that a new trial must be ordered on the basis that the court's delivery of the instructions to the jury was allegedly flawed is to be tested on the following standards: whether the trial was fundamentally unfair to the movant or whether the verdict was contrary to the manifest weight of the evidence. *See Wassell, supra; Cornelius, supra.*

In resolving the issue of fundamental fairness, the trial must be considered in its totality. While the instructions phase of a trial is a significant component, it is only one of the important sections. A trial is a process; every part, from voir dire to deliberations, is an integral aspect.

In its attempt to persuade the court that the delivery of the jury instructions was so contaminated as to render the trial unfair, the plaintiff's lawyer has submitted an affidavit in which he suggests that the court reporter was able to transcribe the proceedings only because she had the court's written notes of the instructions; I believe counsel's contention to be a gross overstatement. In her affidavit, attached to this decision and order as Appendix A, the court reporter avers that she "was able to hear the judge and make accurate notes of the instructions." She also avers that "I

prepared the transcript from my notes" and only used the court's notes "in a few instances."

The affidavit of plaintiff's counsel also states that the plaintiff was "not permitted to be heard on the issue [regarding the submission of written instructions] until after the jury had reached its verdict." The transcript establishes that such was not the case. The plaintiff was heard by the court on that issue on Friday, May 26, 1989, and again on Tuesday, May 31, 1989. (Trial Tr. pp. 717–18) (Trial Tr. pp. 4–5 dated May 31, 1989) On both occasions, counsel for all of the parties were informed in open court that the submission of written instructions to the jury was agreeable to the court provided that the parties stipulated as to the accuracy of the transcript of the instructions. If the plaintiff's objection is that he was not allowed to be heard by the court a *third* time on the same issue, such objection is meritless.

The plaintiff's heavy concentration on the segment of the trial involving the jury instructions disregards all the other substantial portions of the trial process. To support its position, the plaintiff has engaged three experts to evaluate the instructions; the reliability of their conclusions is suspect. Not only are they hired guns, but also it is clear that they failed to consider the trial as a whole.

Unlike Mr. Spear's test group of university students, or the Swineburne Laboratory's analysis or Ms. Hamlin's review or Dr. Schneider's limited presence in the courtroom, the jury in the case at bar had the benefit of experiencing the evolution of the entire trial. On five consecutive days, the jury listened to the parties' contentions and the language of patent law. The lawyers diligently set forth their clients' respective positions in clear, understandable terms throughout the evidentiary presentations, in their summations, and in the jury instructions that they submitted.

Mr. Sohn, the teacher who assessed the "readability" of the instructions, concludes, in part:

I do not believe the instructions were provided to the jury in a manner calculat-

ed to ensure their understanding and application. I believe this is so because of the sole reliance on an oral presentation and the further expectation that complex instructions, not re-enforced by written material, exhibits, charts or other documents, could be comprehended and retained three days after they were presented orally.

Sohn Affidavit, p. 6.

The court has no quarrel with the generalization that individuals learn by repeatedly hearing and seeing information. However, the instructions were not given to the jury in a vacuum. By the time the jury heard the court's instructions, they had already listened to live testimony from many witnesses and had observed demonstrative evidence in the form of photographs, a video tape, a high speed movie, graphs and charts. All of the former, with the exception of the high speed film and videotape, were sent into the jury room for the jurors' use in their deliberations.

Additionally, significant aspects of the instructions were incorporated in the plaintiff's summation to the jury. In his summation, plaintiff's counsel discussed the relevant law and followed that by applying the law to the facts in evidence. The closing argument, which was presented to the jury on behalf of the plaintiff, is attached to this decision and order as Appendix B. Specifically, the following instructions as to the law were highlighted to the jury during plaintiff's summation: (1) the burden of proof (Trial Tr. p. 640); (2) the elements of infringement (Trial Tr. p. 642); (3) imperfect infringement (Trial Tr. p. 644); (4) the scope of a patent (Trial Tr. p. 644); (5) the elements necessary to show lost profits (Trial Tr. p. 646); (6) the meaning of the term "acceptable non-infringing substitute" (Trial Tr. p. 646); (7) reasonable royalty (Trial Tr. p. 649); (8) the definition of willful infringement (Trial Tr. p. 649); (9) the doctrine of substantial equivalents (Trial Tr. p. 664); (10) interpretation of the "means plus function" clause (Trial Tr. p. 665); and (11) knowledge or intent unnecessary to find willfulness (Trial Tr. p. 666).

Litigants are generally able to choose whether to have a jury hear their case. Once a party opts to have a jury decide the factual issues (as FMC did opt in the case at bar), the party has the further choice whether to propound an avalanche of instructions or to provide only those instructions which are necessary for a proper resolution of the case.

In this case, the plaintiff, as master of its presentation, created the situation it now claims is unfair. The length of time (one hour and fifteen minutes) required to submit the instructions to the jury was considerable. In total, 59 separate instructions were submitted to the jury; of that total number, 51 instructions were proposed by the plaintiff. Although the plaintiff drafted all 51 of its proposed instructions, the defendant agreed to the form of 18 of the plaintiff's instructions; the defendant also submitted an additional 22 instructions. Only 10 instructions addressed the so-called "boilerplate" matters (e.g., province of the court and jury). The plaintiff's attempt to take refuge in the argument that the instructions (which it had drafted) "were too complex to be understood, retained and applied in any useful way, absent a written copy" is not impressive. (Plaintiff's brief p. 12).

It was plaintiff's choice to bombard the jury with over 50 separate instructions, some of which did little to advance the substantive issues of the case. For instance, three typewritten pages were devoted to general information concerning the Patent Office, the obtaining of a patent and the elements of a patent. Some substantive areas were overexplained: (1) the burden of proof was stated and restated; (2) eight instructions were submitted on the doctrine of equivalents; and (3) more than ten instructions were submitted on damages. In connection with its present motions, the plaintiff concedes, as it must, that the instructions accurately reflected the law and that the length of the instructions was the result of its choice. (Trial Tr. p. 716).

■ I disagree with the plaintiff's suggestion that written jury instructions

should have been provided to the jury. It is not my regular practice to do so, and it is clear that the law of this circuit does not require it. The plaintiff's request that written instructions be provided to the jury first came at the end of the trial, at 5:15 p.m. on a Friday afternoon. FMC claims it was prejudicial error to condition the submission of written instructions on an agreement between the parties. Since my verbal instructions had taken an hour and a quarter to present to the jury on Friday afternoon, I did not deem it necessary, when we reconvened on Tuesday morning, to undertake the burden of reviewing the accuracy of the 49 pages of typed instructions which had been approved by only one side. Since the plaintiff's request came at the eleventh hour, the court determined that the better course was to allow the parties the opportunity to work out the situation. The fact that they were unable to do so, for whatever reason, does not render the trial fundamentally unfair.

Granting a new trial on any of the grounds proffered by the plaintiff would likely impact future cases, but not for the better. Each side would strategically pack the courtroom with purported experts who would be called upon to assess every aspect of the delivery of the jury instructions and give opinions about what they believe the jury heard and understood. The unsuccessful party would submit briefs and affidavits in support of its motion for a new trial. Assuredly, the prevailing party would mount an equally impressive rendition in defense. Finally, judicial resources would have to be expended in an effort to resolve such motions—motions which are based on conjecture and hypothesis. This court refuses to set such a precedent.

Therefore, IT IS ORDERED that the plaintiff's motions for judgment notwithstanding the verdict and for a new trial be and hereby are denied.

## APPENDIX A

### AFFIDAVIT OF PHYLLIS KAPARIS–BANON

Phyllis Kaparis–Banon, first being duly sworn, states as follows:

1. I am a free lance court reporter working in association with the Ronald L. Bonk Reporting Company. Ronald L. Bonk Reporting Company was retained by the parties in Case No. 88–C–365 to provide daily copy of the proceedings.

2. On Friday May 26, 1989, I was the court reporter responsible for recording the proceedings in Case No. 88–C–365 on that date. Specifically, I recorded the judge's instructions to the jury.

3. At the conclusion of the proceedings, Mr. Niro, counsel for the plaintiff, requested that I prepare a transcript of that portion of the afternoon's proceedings which encompassed the court's instructions to the jury; such transcription was to be completed on an expedited basis.

4. During the judge's instructions, I was able to hear the judge and make accurate notes of the instructions.

5. At times, the judge spoke rapidly but I was able to take down the content of the instructions.

6. As is my routine practice, I requested a copy of the text of the instructions. I prepared the transcript from my notes and the copy was used only for reference if needed.

7. In order to prepare the actual transcript, I used my notes as the primary source. I was able to and did refer to Judge Gordon's written instructions for clarification purposes in a few instances.

Dated at Milwaukee, Wisconsin, this 25th day of July, 1989.

/s/Phyllis Kaparis–Banon
Phyllis Kaparis–Banon

Subscribed and sworn to before me this 25th day of July, 1989. My commission is permanent.

/s/[Signature]
Notary Public

## APPENDIX B

THE COURT: Unless counsel have something in advance, we'll call the jurors in for your summations.

MR. NIRO: Thank you, Your Honor.

THE COURT: Mr. Kania?

(Whereupon the jury entered the court-room.)

THE COURT: Are we ready to proceed with the summations? And first we'll call on Mr. Niro.

MR. NIRO: Thank you, Your Honor. At the beginning of the trial you'll recall we talked about the fact that this is a civil case, not a criminal case. And, of course, Judge Gordon will instruct you on the law at the conclusion of the summation, but among those instructions will be a definition of what the burden of proof is in a civil case. That is, you must consider the evidence by a preponderance. What does that mean, preponderance? In a case like this it means that if you had a scale and you took FMC's evidence and you put it on one side, and you put H & K's evidence on the other side, you would have to balance whose evidence is more persuasive, has FMC established its case so that the scale tips slightly in its direction? And if that's so, then infringement must be found. And if that's so, then damages must be awarded. And if you find that the infringement is willful, then it's your obligation to so state. Now, what's the evidence shown in the case? Where are the chips that FMC brings to the scale? You can begin really at any of three places and get to the same result, which is that the elements of this claim or their substantial equivalents are in the H & K device.

Now, where do we begin? You can start with Mr. Wheeler's opinion, the opinion he wrote before the lawsuit began. What did he say in that opinion? He said in that opinion that the first eight elements are there and the ninth he said you have to have a beater here, because he didn't realize that paddles could be means for flinging the mass back to the screen. But his client knew that. Mr. Hamachek, when he testified in this case, agreed that the paddles can be a means for thereafter flinging the mass back. And he said so not only at trial, but he said so in the letter that he sent to Mr. Wheeler, because the only basis he felt that there was no infringement is because he felt item No. 6 wasn't there, because he had the upper satellite beater in the wrong position. He had it over here instead of over here. And Mr. Wallace has said exactly the same thing. When he wrote to Mr. Wheeler, he had one reason for concluding that there was no infringement, and that's because he believed No. 6 wasn't there. And, again, he based that on the fact that some of the particles come up here, but not all of the particles and, therefore, he felt that element six wasn't there.

But what about the testimony of Mr. Slates? Has that been contradicted? I don't think so. Each and every element of the claim or its substantial equivalent is there.

Now, the Court, of course, will tell you what the standard for infringement is, but one of the things that establishes infringement shows that if you start with the testimony of Mr. Hamachek and you start with the testimony of Mr. Wallace and his letter and you say six, the means for flinging the mass from the upper ascending portion to the screen upwardly ascending side of said generally centralized beater, this element, if you begin there, what evidence has been presented to show what happens inside that machine when you run it? We had a movie and that movie took you inside the machine and showed you what happens inside that machine. And when this screen is rotating not at some artificially high speed, as Mr. Wallace admits this element would be present in, but at the speed that the defendant tells everybody to operate it at. What did the movie show? It showed material coming in contact with the upper satellite beater and being directed down into the main beater.

And the law doesn't require that you have to use something all the time in order to be an infringement. This design that was sold, was sold so that that satellite beater could be used because it got results. Now, what's the proof of that? It would get better results. The proof of that is in the fact that every customer that wanted to buy a machine in the years 1987 and 1988 bought one with the upper satellite beater. If it served no purpose, if it was

no good, why would they buy it? And the Green Giant tests, which aren't in dispute here, these were 82 tests done over a two-year period of time, and they showed increased productivity when you had the upper satellite beater there.

Now, how much was the increased productivity? The numbers don't lie. The averages were taken, the numbers were calculated and there's no dispute about that. There's increased productivity not only of the total amount of peas but of the more valuable peas. And that amounts to a lot of money, $56,000 a year. If you want to take the 1987 numbers, if you want to go back into time, it could be as high as 66,000, but certainly not less than 53,000. And that was the testimony yesterday. The swing here isn't that great. The benefit is real.

Now, to infringe a patent, you don't have to be perfect about it. You can infringe a patent by being 70 percent there, 60 percent there. Now, H & K says we designed a machine that had two satellite beaters, but you were selling one with five or four, so we don't infringe your patent. But like we talked about in the opening, the beginning of the case, you have to give examples of what your invention is when you describe it and when you teach somebody how to practice you invention, but you don't have to discuss everything or describe everything. And the patent tells you what to do. It says the most important two satellite beaters that you can put in are the one that's here and the one that's here, and that's exactly what they did. Now, the claim of the patent, that's what defines the invention. That's what defines the property right. You might describe as your invention a horse or a cow, but you have the right to claim as your invention, if you're the first one to do it, an animal. And if somebody makes a kangaroo, it's still an animal. It still infringes that patent.

Now, Mr. Slates testified that the FMC was a 10, it was the best one, and that's what FMC commercialized. But by commercializing that product, it didn't surrender the right to prevent somebody from making a seven, the two satellite beater design. It's remarkable I think that we could go inside that machine and see what really happened. Was there any evidence to refute that? I don't think so. And balance the evidence. Where does the scale tip? Is it tipping for FMC or is it tipping for H & K? And if it tips for FMC, it's your obligation to find that there's an infringement.

Now, Mr. Wallace said with respect to the unit that when you run it too fast, the material comes in contact, and when you run it too slow, it won't come in contact, but at the same time H & K tells you that operators will operate too fast. And when it was operated in the movie, it was operated just the way H & K tells you to do it, 25 rpm.

Now, if you find infringement, then the question becomes has FMC been hurt, and if it's been hurt, how badly has it been hurt?

Again, what's the balance here? Who has the chips on the side that tilts that scale? To show lost profits FMC has to show four things. First, that there was a demand for the product and people wanted it. Second, that FMC had the capacity to make the additional units. Third, that there were no acceptable non-infringing substitutes, and fourth, what the amount of that damage was.

Now, was there a demand? Every customer that bought the machine from H & K had two satellite beaters. Every customer that bought the machine from FMC had multiple satellite beater machines. Mr. Wallace said that the upper satellite beater was a decorative object, but if it was a decorative object, his customers wanted that decorative object, and I think when you look inside the machine, it's fairly clear that people weren't buying it because they thought it was a decorative object. The demand was there.

And did FMC have the capacity? Again, no evidence to the contrary. It could have made 200 machines a year. All it had to do was make 40 more.

Were there acceptable non-infringing substitutes? What's that mean? To be acceptable you have to give the advantages of the patent invention. What evidence has there been that there was anything out there that people wanted more than the patented invention? There's none. The evidence shows that everybody that had to make a choice, made the choice to buy the patented design either from FMC or from H & K.

And as to the amount, the evidence presented yesterday on how you calculate the lost profits is unrefuted. There's no dispute about that. H & K put a witness on that said the calculation was wrong, the mathematics was wrong the numbers were juggled. In fact, the numbers are conservative, because 20 percent of the retrofits were calculated as being the basis for the damage claim instead of 100 percent. If people had to make a decision whether to get rid of an old machine that didn't produce enough peas or as many peas or buy a new one, maybe all of them aren't going to decide to scrap the old machine and buy the new one no matter what the economics pay, but some of them are. And if you can get a two point—or 280 percent return on your investment so you get $2.80 back for every dollar you put in, you can pay for the machine in a matter of two and a half years, and then surely at least 20 percent, maybe even 100 percent would have purchased a patented machine from FMC rather than get rid of—rather than keep the old machine. That's the evidence of lost profits. Where do the scales tip? What evidence have we heard to the contrary? We submit that the evidence shows infringement, the evidence shows lost profits.

Now, what was the response that we hear from H & K? First thing they say is, this thing really wasn't all that valuable, who needed it? Well, the customers needed it because they bought it. They specified it, they wanted it, and that's what they sold. What do they say you base the calculation on? They say it's just a five, $20,000 item in there so why should you award damages based upon the cost of the ma-chine? And when I hear that, I think of the proverb, an ancient proverb about the nail and the horse and the kingdom and the battle. It goes something like this: For want of a nail, a shoe was lost. For want of a shoe, a horse was lost. For want of a horse, a rider was lost. For want of a rider, the battle was lost. For want of a battle, the kingdom was lost, and all for the want of a horseshoe nail.

The value of the second satellite beater is a little like that nail. You don't base its worth on what it cost to have the nail. You base its worth on the value of the kingdom, and that's $56,000 per machine per year for 10 years. The minimum, the law says the minimum that can be awarded is a reasonable royalty.

If the evidence tipped the other way on the question of lost profits, if H & K had evidence that outweighed the evidence that FMC submitted, that we submitted in this case, the minimum damage is a reasonable royalty, and what's that? Mr. Beart testified, again without contradiction, 30 percent is a reasonable royalty. Where was the H & K witness with experience in patent licensing that said anything else? Where was the H & K witness that said 15 percent isn't reasonable? And why is it reasonable? It's reasonable because a customer can pay for the royalty in what he saves or the increased productivity in one year, less than a year. Half a year for the retrofits. I think 30 percent is reasonable. I think the evidence shows it to be reasonable. Where is the balance? Where is the contrary evidence? Which way do the scales tip? And the minimum is shown right here on Plaintiff's Exhibit 134, $3,222,000. But no matter what the minimum is, what's right is the profits that FMC lost.

Now, was the infringement willful? Did they mean to do this? Again, I think the scales tip in favor of FMC. What's the evidence show? We found out this morning for the first time that Mr. Wallace knew about the patent and had been contending all along they didn't know about it even though they had been climbing over the machine and presumably saw the plate.

He admitted this morning he knew about the patent and he's known about the patent since 1970, mid 1970s.

And what did they do when they got the letter? They sent a drawing to their attorney that showed the critical component in the wrong place on the wrong side. But what did they do before? What did they do when they designed this? What did they do when they were selling it initially? Did they go out and get an opinion then, no. And what about the opinions that they said were privileged? After the contest began and they talked privately with their attorney, they don't want to share with anyone what was said, and you can presume from that that the reason they don't want to say what was said is that they were admitting then what they deny now, that they infringed.

Now, when I was growing up in Pittsburg years ago I had a paper route, and I don't know if it's true today, but then you had an exclusive right in a sense to sell that paper to your customers in your territory. Wasn't quite like a patent, but you had your customers, your neighborhood and you delivered the paper to them and you were paid.

Let's suppose that the paper route's a little like a patent. It gives you the right exclusively in a territory to use your invention, and somebody comes along improperly and takes half of your business, half of the potential business, does so for two years. And let's assume that somebody makes $21 a week from that paper route and from the other benefits that he gets from his business I think it would be fair to say that he ought to pay three days worth of the money he makes and has made in order to compensate the person that had that exclusive right. And although the defendant here is H & K, it's owned by Kloeckner, and they don't make $3 a day, they make 3.6 million dollars a day. Mr. Wheeler said in the opening FMC is trying to put them out of business. I don't think anybody is going to go out of business there when they make 3.6 million dollars a day. And the damages FMC is asking for are eight million dollars. That's two and a half days of the money that Kloeckner makes.

We'll ask at the end of the—of your deliberations that you award FMC the money that it lost, the profits that it lost and that you compensate them for the infringement that's taken place, the willful infringement of the defendant, H & K.

We thank you for your attention. We thank you for your interest in this case and giving us the opportunity to present the case to you. Thank you.

THE COURT: Thank you. And now I'd like Mr. Wheeler to proceed.

[Editor's Note: Portions of Appendix B were omitted by the court for purposes of publication.]

confidence that you will vindicate the Hamachek machine. It does not infringe the FMC five-beater patent.

THE COURT: Thank you. We will hear once again from Mr. Niro.

MR. NIRO: The comparison that defendant continually wants to make between the five-beater FMC machine and the three-beater H & K machine is an interesting exercise. But it's not what the law permits in making a decision on the question of infringement. The question of infringement is resolved by looking at the claim and comparing it to the accused device. And that's what the parties to this case agreed was the law before this case started. In the agreed statement of uncontested facts 32, question of infringement is resolved by comparing claim one of FMC's patent with the accused H & K machines, not by comparing FMC's commercial multibeater machine with H & K's commercial multi-beater machine.

Let's go to the claim. Mr. Wheeler, the defendant, now tells you that they didn't put all the reasons in the letter that they sent to FMC. They really believed they didn't infringe for a lot of reasons, but they didn't want to clutter the letter with all those reasons. But the letter that Mr. Wheeler sent to his client wasn't being written to FMC. Now, you surely would tell your client if you believed that one of these elements wasn't here, because you didn't intend that letter to go to FMC. And what did the letter say, August 25, 1987, to Frank Hamachek? Did it say

there was no generally centralized beater, which you're told now? No. It said, and I quote it, Looking now at claim one you clearly have a generally central beater. Why did they tell Hamachek that then? And what did it say about this element six? Did it say it wasn't there? No. It said it is true that your sketch does not show a beater on the rising side—which was wrong because the wrong sketch was being looked at—and then it goes on, but it does show a beater at the top that could very easily be interpreted as either within the claim or equivalent to what's claimed. Now, they say it's not there.

And we ask you to listen to the instructions carefully because the instructions on the law will say that if material hits this upper beater—and you saw it in the movie—and you must find that there is a means for flinging the mass as defined in number six. That's what the law is. And you've seen it. And they have admitted it. It operates that way, not all of it, some of it. That's all that has to happen.

And as to element nine, H & K keeps taking the position now that the word sieving beater is in there. Doesn't say sieving beater. If the intention was to say sieving beater, it would say and sieving beater for thereafter flinging. It doesn't say that. Other claims say that. But not this claim. It says, means for thereafter. And the law as you will be instructed says that means as a matter of patent law means what's shown in the patent law and equivalents, and what's shown in the patent law is that satellite beaters can be used. But in addition to that, you can have paddles that are used.

Now his question of the Green Giant data, let's think about that for a moment. It is important. There were 82 tests. The data was prepared and an average was taken, and a calculation was made on that average. Absolutely nothing suggests to the contrary. There was a proposal surely that Green Giant prepared to justify the purchase and conversion of four machines. But it didn't do the calculation of how much money the additional peas were

worth. If you have to justify the expenditure of $100 or $1000, you don't have to show that you're going to make one million. There is no evidence that controverts the accuracy of the calculation as to the value of the Green Giant tests at $56,000 a year.

Now on willfulness, if I understand the contention, it is that the infringement wasn't willful because Mr. Wallace didn't think that patent covered his product. But the law doesn't say you have to think it covered your product. It says when you know about the patent, you have to investigate. And what did he do at the time he decided to make this product? He didn't go out and investigate. He didn't go out and get an attorney's opinion. After he got the letter from FMC, after he had already done what he had done, that's when they went out and asked for the letter. That's too late. That's not investigation. And when they send the document that shows where one of the critical components is, they send one that shows it in the wrong place.

Now why did they infringe? They said it in the confidental memorandum under competitive analysis. FMC was introducing a bigger machine. They had to do something. They decided not to make a longer or wider machine. They had to increase the capacity, and they did what they had to do. That's willful infringement. And we will ask at the conclusion that you find willful infringement.

Thank you very much.