443 So.2d 843 (1983)
Ivy WALLACE, et ux
v.
EMPLOYERS MUTUAL CASUALTY COMPANY.
No. 54,470.
Supreme Court of Mississippi.
December 7, 1983.
*844 John E. Gregg, Raymond, W.N. Patterson, Jackson, for appellants.
Joe W. Hobbs, Hobbs & Brand, Jackson, for appellee.
Before BROOM, DAN M. LEE and PRATHER, JJ.
PRATHER, Justice, for the Court:
Ivy and Merelene Wallace, plaintiffs below and appellants here, were the owners of a $26,000 contents coverage insurance policy issued by the defendant, Employers Mutual Casualty Company, covering the contents of a restaurant owned by the Wallaces known as the Western Way Station located in Jackson, Mississippi which burned.
This action was brought by the Wallaces to recover the proceeds. The insurance company defended on the grounds that the fire was the result of arson committed or caused to be committed by the Wallaces, that the Wallaces forfeited their rights to the proceeds by false swearing and misrepresentation, and that the coverage was suspended due to an increase in moral hazard. From a jury verdict for the defendant, the Wallaces appeal. We reverse and remand for a new trial.
The questions raised by the Wallaces on appeal are:
(1) Whether the court erred in permitting the deposition of Stuart D. Abshire to be introduced into evidence;
*845 (2) Whether the court erred by allowing appellee to cross-examine Merelene Wallace regarding a written statement she signed which was not produced pursuant to discovery requests;
(3) Whether the court erred in submitting the defense of increased hazard to the jury; and
(4) Whether the court erred in denying a new trial on the basis that the verdict was against the overwhelming weight of the evidence.
In May and June, 1978, Ivy and Merelene Wallace leased a building located at 1209 West Northside Drive, Jackson, Mississippi, from Stuart Abshire. Abshire had been using the building and premises for his swimming pool construction business. He continued to use a part of the premises despite the fact that the lease instruments purported to give the Wallaces a leasehold interest in the entire lot.
At the time the building was leased to the Wallaces, Abshire owned an insurance policy written by the defendant, Employers Mutual Casualty Company (Employers Mutual) with $10,000 coverage on the building and $10,000 on the contents. The Wallaces had the Employers Mutual agent, Sal Lembo, change the policy to include them. The contents coverage was deleted and the building coverage was increased to $25,000. Abshire later denied authorizing this change. The Wallaces then purchased a $26,000 contents policy written by Employers Mutual from an agency that had purchased the Lembo Agency. This agent advised Abshire that he was going to write some insurance for the Wallaces. Later Abshire took out a new policy with U.S.F. & G. with $10,000 coverage on the contents and $10,000 on the building. Thus, there was $71,000 worth of coverage on the building and contents where the restaurant was located.
To renovate the building for use as a restaurant the Wallaces incurred remodeling and equipment expenses of over $34,000. To finance this expenditure, the Wallaces used $30,000 in personal funds and $15,000 in loans from two different banks. The restaurant opened for business in October, 1979.
Between the time of the restaurant's opening and its destruction by fire, the relationship between the Wallaces and Abshire became stormy. Chains and locks placed on trash dumpsters by the Wallaces were cut by Abshire as he continued to use the dumpster in his business. A confrontation between them occurred over a portable sign placed on the lot by Abshire. A wooden fence put up by the Wallaces was torn down by Abshire. Threats of bodily harm were made by both sides. Trouble with the sewer system provoked another confrontation. A lawsuit was filed by Abshire asking that the Wallaces be enjoined from obstructing his use of the premises.
On January 19, 1979, Abshire obtained a court order preventing the Wallaces from obstructing his access to the leased premises. On January 25, 1979, Abshire discussed the over-abundance of insurance coverage with the fire marshall and deputy fire marshall indicating that he believed the building was going to burn. On January 26, 1979, the Wallaces were notified that their $26,000 contents policy would be cancelled effective February 9, 1979. The building housing the restaurant burned on January 26, 1979.
On the night of the fire Merelene Wallace went to the restaurant a little before 12:00 midnight to close up. Normally her son performed this task but was not available on this particular night. She locked the doors behind her and took the two cooks home. The route from the cooks' home to Mrs. Wallace's home ran by the restaurant. At trial, Mrs. Wallace testified that she passed by the restaurant on the way home, but that she did not stop. Mrs. Wallace arrived home sometime between 12:30 and 12:45 a.m. The fire was reported to the fire department at 12:30 a.m. Mrs. Wallace was notified of the fire at about 1:00 a.m. by a phone call from her brother.
On January 30, 1979, the Wallaces met with Don Hicks, an arson investigator of twenty-two years experience hired by the *846 attorney representing Employers Mutual. In a statement taken by Hicks, Merelene Wallace represented that after she dropped the cooks off at their homes, she drove back by the restaurant. She noticed an old blue car parked nearby, and pulled into the restaurant parking lot to investigate, but found no one there. This statement, consisting of three pages, was signed by both Ivy and Merelene Wallace. The last sentence of the statement acknowledges that they read the statement and that its contents were true. Both plaintiffs denied that they were permitted to read the statement and further claimed that they were not allowed to have a copy.
On March 21, 1979, an examination under oath was taken by Merelene Wallace pursuant to the provisions of the insurance policy. In that examination, Mrs. Wallace admitted being in the restaurant sometime after 12:00 midnight on the night of the fire. She stated that she arrived back at her house at about 1:00 a.m. after she had taken the cooks home.
An investigation of the burned premises by Hicks revealed the existence of pour or burn patterns located in a storage area in the central section of the restaurant. It was his expert opinion that these pour patterns were caused by a hydrocarbon liquid, such as gasoline, kerosene, alcohol or acetone. He concluded that the fire was the act of an arsonist.
An investigation by the Jackson Fire Department revealed that there was no forced entry into the building. It was completely locked when the firemen arrived on the scene. There were three doors to the restaurant. The plaintiffs and their son had a key to all three doors. Mr. Abshire had a key to one of the doors, but no one else had access to the building. Captain fire investigator Joseph Graham concluded that there was no doubt that the fire was set by an arsonist.
Following the fire, the Wallaces filed their claim with Employers Mutual on their $26,000 contents policy, the total loss being $30,440. The claim was denied, and this suit resulted. Likewise, Abshire filed his claim on the building and contents under his U.S.F. & G. policy. U.S.F. & G. paid this claim as there was no suspicion that Abshire caused the fire.
After this lawsuit was filed but before trial, Stuart Abshire died from an extended illness. At the time the trial was set, Mr. Abshire was ill and could not attend. A continuance was granted. Time for discovery had expired, and there was nothing mentioned in the continuance order granting additional discovery time, but the trial judge verbally instructed counsel to get Abshire's deposition. Timely notice of taking Abshire's deposition was filed and the deposition was taken. The attorneys for the plaintiffs were present and thoroughly cross-examined Abshire. Because of Abshire's death his deposition was read into evidence at the trial over the objection of the plaintiffs.
Evidence of the financial status of the plaintiffs and their restaurant was adduced at trial. This evidence showed that the proposed renovation of the building for the restaurant was $20,000, but that actual costs were over $34,000. The operation was financed with $30,000 in personal funds and loans.
Monthly payments owed at the time of the fire loss included $171.00 on a first mortgage, $160.00 on a second mortgage; $300.00 for remodeling costs; $250.00 for building rent; $162.00 on the $5,000 loan; $100.00 for utilities; $125.00 for food and $171.00 on a new car.
Other debts included $2,600.00 on an open note to the Bank of Hazlehurst; $1,500.00 on an open note to Deposit Guaranty National Bank; and $1,000 to Sears.
The income statement of the restaurant showed that it suffered losses in October, November and December of 1978 and January of 1979 of $2,490.00; $317.24; $575.17 and $215.00 respectively. At the time of the fire the only income the plaintiffs had was a monthly payment of $617.00 from Social Security.

*847 II.
The first issue is whether it was error for the lower court to permit the deposition of Stuart Abshire to be received into evidence. The appellant's contention is two-fold: (1) that time for discovery had expired and (2) that the testimony was not perpetuated according to statute. As to the first argument, we note our Mississippi Uniform Circuit Court Rule 2.08:
All discovery shall be completed within forty-five (45) days from service of process upon the applicable defendant. Additional discovery time may be allowed with leave of court upon written motion setting forth good cause for the extension.
Also, Mississippi Code Annotated section 13-1-230(b)(3) (Supp. 1983) states that, "The Court may for good cause shown enlarge or shorten the time for taking the deposition." Id. at 111.
When it was learned that Abshire would not be able to testify due to medical reasons, a continuance was granted. The verbal instruction given by the court was an indication that good cause had been shown to extend discovery time. Abshire was seriously ill as he had been undergoing hyperthermia treatments for cancer. Although the deposition was taken of Abshire over appellants' objection, appellants' attorneys were present and they thoroughly cross-examined Abshire.
Secondly, a deposition of a witness may be used for any purpose if the court finds that the witness is dead so long as that deposition is admissible under the rules of evidence. Mississippi Code Annotated § 13-1-232 (1972) (Supp. 1983).
The argument by appellants that the testimony of Abshire was not properly perpetuated under Mississippi Code Annotated section 13-1-227 (1972) (Supp. 1983), is without merit. That section refers to the taking of depositions before an action is commenced or pending an appeal, neither of which is the case here. We find no error in admitting the deposition of Abshire into evidence.

III.
The next question is whether it was error to permit appellee to use the statement of the plaintiffs taken by Hicks to impeach the testimony of Merelene Wallace.
Mrs. Wallace testified on direct examination that she did not stop at the restaurant minutes before the fire was reported. In the statement which she and her husband gave to independent investigator Hicks four days after the fire, Mrs. Wallace stated that she did stop at the restaurant on the way home after taking the cooks home. This statement placed her at the restaurant just minutes before the fire was reported.
During the cross-examination of Mrs. Wallace the statement was offered to impeach Mrs. Wallace's prior inconsistent statement. Objection was made to its use on the grounds that the statement had not been produced pursuant to several discovery requests, specifically a request for production and inspection and request for bill of particulars. Appellee defended on the ground that the statement was privileged as work product since Hicks was an independent investigator hired by appellee's attorney and not appellee. The trial judge allowed the use of the statement for impeachment purposes. The statement was later introduced into evidence without additional objection.
Work product can be discovered "only upon a showing that the party seeking discovery has substantial need of the materials in preparation of his case and that he is unable without due hardship to obtain the substantial equivalent of the materials by other means." Mississippi Code Annotated § 13-1-226(b)(3) (1972) (Supp. 1983). However, that section further provides that a party may "obtain without the required showing a statement concerning the action or its subject matter previously made by that party." Thus a statement of a party is not work product and is discoverable.
The appellants in a request for production and inspection asked for:

*848 All investigative reports concerning plaintiffs and their claim, including but not limited to any statements, sworn or unsworn, or affidavits made by the plaintiffs... .
The statement made by the plaintiffs to Hicks was not produced for inspection. It, being discoverable, should have been produced.
In Square D Co. v. Edwards, 419 So.2d 1327 (Miss. 1982) this Court stated that:
Vague or unresponsive answers to interrogatories cannot be tolerated if the process of discovery is to survive as a reasonable method of discovering the information requested in the interrogatories. One of the principal reasons for permitting interrogatories for pretrial discovery ... is to prevent trial by ambush and surprise... .
(Id. at 1329).
This same reasoning applies to all discovery methods including requests for production and inspection.
A similar discovery issue was raised in Holm v. Superior Court, 42 Cal.2d 500, 267 P.2d 1025 (1954). In that case, the plaintiff was injured as a result of the negligent operation of a municipal bus. The plaintiff gave a statement to the city's claim investigator which was transcribed as she made it. The attorneys for the defendants sought a writ of prohibition to block a court order to disclose "A document containing a signed statement made by [plaintiff] to a claims investigator of the [defendant] concerning the facts of the accident." The argument by the attorneys was that the statement was privileged as being within the purview of the attorney-client relationship. The California Supreme Court said with respect to that statement that:
Her assertions that she was not given a copy of the statement and that she does not remember what she said are not disputed. She does not seek to have disclosed any communication from her adversaries to their attorneys. She merely seeks the record of a communication which she herself made in an "arm's length" conversation and which was transmitted to her adversaries' attorneys. Clearly as to the document embodying this communication there is no attorney-client relationship, the communication was not made nor intended to be in confidence, and the privilege did not attach. Accordingly the document can properly be reached under the statutory provisions.
(Id. at 507, 267 P.2d 1029).
Discovery requests were made for all statements of the plaintiffs, sworn or unsworn. Since this statement was not disclosed, we hold this nondisclosure error and reverse and remand for a new trial.

IV.
Since we reverse and remand this case for a new trial, we choose not to make comment upon the weight of the evidence.
However, we are compelled to comment upon the instruction to the jury placing in issue the question of whether there was an increase of moral hazard which would suspend appellant's fire coverage. We hold that it was error to submit the "increase in moral hazard" instruction to the jury.
The theory of increase in moral hazard was one of three defenses that the appellee had in this case. This defense has its origin in a provision of the fire insurance policy issued by appellee which reads:

Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto this company shall not be liable for loss occurring (A) while the hazard is increased by any means within the control or knowledge of the insured.
The insurance policy here contains a provision for suspending or restricting insurance coverage upon an increase in the risk hazard which increase is within the control or knowledge of the insured. Such an increase may be of a physical nature or of a moral nature. The insurer here contends that the present case presents facts which constitute an increase of moral hazard.
Moral hazard with respect to fire insurance is defined as:

*849 The risk or danger of the destruction of the insured property by fire as measured by the character and interest of the insured owner, his habits as a prudent and careful man or the reverse, his known integrity or his bad reputation, and the amount of loss he would suffer by the destruction of the property or the gain he would make by suffering it to burn and collecting the insurance. [Black's Law Dictionary 647 (5th Ed. 1979)].
The appellee here contends that any act or change by the insured that results in the change of conditions will increase the temptation to destroy the property for the purpose of collecting the insurance and, therefore will increase the moral hazard. We do not agree. Rather we hold that the act or change that avoids insurance coverage contemplates that the alteration is material and substantial as would be viewed by a person of ordinary intelligence, care, and diligence. The increase in risk for the insurer must be such that he could not reasonably have been presumed to assume contractually. If the conditions affecting the risk assumed by the insurer are materially and substantially affected by means within the control or knowledge of the insured, then suspension of insurance coverage is proper.
Here the factor of multi-insurance policies is present. However, the record shows part of the insurance was secured by the lessor, Abshire, as well as the insured. Therefore, the increase of insurance was not within the control of the insured, and that factor does not warrant consideration here.
The additional factor of deteriorating financial condition of the Wallaces is presented as an increase of moral hazard sufficient to suspend the insurance coverage. We are of the opinion that this record fails to show two factors necessary to agree with appellee's argument. First, there is no proof that the alleged deteriorating financial condition was within the control of the Wallaces. Even if such is shown, a worsening financial condition of an insured must be accompanied by some physical change in the condition, usage, or occupancy of the premises. Charles Stores, Inc. v. Aetna Ins. Co., 490 F.2d 64 (5th Cir.1974). Such facts are absent the record here.
Secondly, this factual situation of the Wallaces' financial data does not show an increase in the hazard after the issuance of the policy.
In the case at bar, there was no proof at all that the financial condition of the Western Way Station had deteriorated since the issuance of the $26,000 contents policy. Although the plaintiffs had considerable personal debts, that debt existed when the policy was issued. Moreover, the restaurant was losing money from its conception and the insurance policy was issued with knowledge of these losses. Also, the restaurant's financial records indicate that while the restaurant incurred monthly losses, those losses were heaviest in the first month of operation. Thereafter, these losses decreased and leveled off during the three months preceding the fire.
We hold that where the worsened financial condition of an insured property is relied upon to suspend coverage as an increase in risk, there must also be evidence of a physical change in the condition, occupancy, or usage, of the premise before an increase in moral hazard instruction can be given to the jury. Since this was not shown in the case sub judice it was error to give this instruction.
REVERSED AND REMANDED FOR NEW TRIAL.
PATTERSON, C.J., WALKER and BROOM, P. JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and ROBERTSON, JJ., concur.